PACIFIC NORTHERN TIMBER COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 91–1340C.

United States Court of Federal Claims.

Dec. 18, 1992.

James F. Clark, Juneau, AK, for plaintiff.

Harold D. Lester, Jr., and Jeri K. Jomers, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Thomas W. Peterson, Washington, DC, for defendant; Robert A. Maynard, U.S. Dept. of Agriculture, of counsel.

## OPINION

BRUGGINK, Judge.

This Tucker Act[1] claim is before the court on defendant's motion to dismiss for lack of jurisdiction following transfer here from the United States Court of Appeals for the Federal Circuit.[2] 944 F.2d 912.

1. 28 U.S.C. § 1491 (1988).

2. *See* discussion *infra* p. 334.

3. Rate redetermination was to occur according to the guidelines in ¶ 2(b), which read in part as follows:

> *Redetermination of Rates.* The Forest Service shall before January 1, 1962, make a redetermination of rates for stumpage and for sale area betterment for spruce logs.... Before January 1, 1967, and before each January 1 of each fifth year thereafter during the time this contract remains in force, the Forest Service shall make a similar redetermination of the rates for all species and products to be removed during the 5–year period next following such date. Such redeterminations shall be made in accordance with the standard method then in use by the Forest Service

The issue to be decided is whether plaintiff, Pacific Northern Timber Co. ("PNT"), failed to file within the six-year limitations period or during a tolling thereof. For the reasons that follow, the motion is granted.

## I. FACTUAL BACKGROUND

On June 9, 1954, the Government, acting through the United States Forestry Service, awarded contract No. A 10fs–1283 to PNT. As originally written, the contract provided for the government's sale of approximately three billion board feet of timber located in the Tongass National Forest, Alaska over a 50–year period ending December 31, 2006. However, because PNT failed to install a pulp plant as contemplated in the contract, the contract term was shortened by 25 years. The contract thus terminated December 31, 1981. Paragraph 2 ("¶ 2") of the contract provided for initial rates of pay for the timber and for rate redetermination for each five-year period thereafter for the duration of the contract.[3] By the terms of ¶ 2, PNT was to receive advance notice of the rates recommended by the Regional Forester to the Chief of the Forestry Service ("Chief"). This notice allowed PNT the chance to make suggestions as to rates with which it disagreed. If the parties continued to disagree as to the redetermined rates, the Chief of the Forest Service would resolve the disagreement based on a review of both PNT's suggestions and the Regional Forester's recommendations.[4]

> for timber appraisals and will include, for the species involved in the redetermination, consideration of the following factors, all during a period prior to the redetermination sufficient in the judgment of the Forest Service to form a reasonable basis for the determination.... Rates fixed as the result of such redetermination will be equitable to the purchaser in comparison with the rates on sales of comparable timber on the Tongass National Forest....

4. Paragraph 2(c), which provided for the Chief's review, read as follows:

> *Emergency Rate Redetermination.* Upon receipt of a written application from the purchaser wherein it is shown that, because of substantial changes in market or other economic conditions, current rates are unreason-

The contract also contained Paragraph 22 ("¶ 22"), which read as follows:

> *Complaints by Purchaser.* Complaints by the purchaser as to any action taken by a forest officer respecting this contract shall not be considered unless made in writing within thirty (30) days of such action to the forest officer having jurisdiction unless the purchaser furnishes satisfactory reason for allowing a longer time.

On December 30, 1976, the Regional Forester sent PNT the rate redetermination appraisal summary for the final five-year period, 1977–1981. PNT persuaded the Chief to make some changes in the rates in early June, 1977. Still dissatisfied, PNT appealed to the Department of Agriculture Board of Contract Appeals ("Board" or "AgBCA") on June 24, 1977. PNT complained that in redetermining the rates, the Forest Service had breached the contract by not applying its "standard method then in use," resulting in rates that were not "equitable." PNT first sought a new appraisal, but after the contract was completed, PNT amended its complaint to seek a refund based on the difference between the base stumpage rate as to which the parties originally contracted and the rate established by the Chief. The complaint alleges that the Board's jurisdiction arose pursuant to 7 C.F.R. § 24.4(e) (1976), a provision that precludes the possible application of a disputes clause.[5]

PNT's current parent corporation, Alaska Lumber & Pulp Co. ("ALP"),[6] also had a 50–year contract to purchase Tongass timber. Unlike PNT's contract, the ALP contract provided for an appeal of the Forest Service's redetermined rates to a three-member rate review board. At the time PNT was making its appeal to the Board, ALP had an appeal pending before the rate review board. ALP's appeal concerned rate redeterminations for the five year period beginning in 1976. Under the circumstances, PNT and the Forest Service agreed to suspend PNT's appeal proceedings until the Secretary of the Department of Agriculture ("Secretary") could review and decide on the rate review board's recommendations as to the ALP contract. The rate review board issued its recommendations on July 27, 1979, but on August 23, 1980, the Secretary rejected them. PNT's appeal was thereafter activated.

In 1983, the Board held a hearing on the PNT appeal, after which it allowed the parties to supplement the record with revised exhibits and experts' affidavits. After the presiding administrative judge retired, the succeeding judge heard further oral arguments in 1987. On September 13, 1990, more than 13 years after PNT first filed its notice of appeal, the Board rejected PNT's appeal.

The Board held that the Contract Disputes Act ("CDA")[7] was not applicable because the dispute occurred before the CDA took effect, nor could its jurisdiction arise

---

ably high, the Chief, Forestry Service, in his discretion may redetermine and establish the stumpage rates and designate a date when the rates as redetermined shall be effective, which date shall be the earliest practicable.

5. Section 24.4(e) provides, in pertinent part, as follows:

> *Appeals from decisions of contracting officers of the Forest Service.* The Board shall have jurisdiction of appeals from decisions of "contracting officers of the Forest Service," [Forest Supervisor, Regional Forester, or Chief of the Forestry Service designated under contract as the contracting officer, *see* 7 C.F.R. § 24.10(d) ], Department of Agriculture, in which the issue under appeal relates to a breach of the terms or provisions of a contract except that:

(1) Appeals subject to Board jurisdiction involving Forest Service decisions under § 24.4(a) or (d) shall be excluded from jurisdiction under this paragraph,

(2) Appeals subject *to administrative review* under 36 C.F.R. § 211.2 involving management and policy decisions and not involving breach of contract shall be excluded from jurisdiction under this paragraph, and

(3) No appeal under this paragraph shall lie where the relief sought is reformation of contract, monetary damages or amendment of contract at the discretion of the Forest Service to extend the term of the contract.

6. ALP acquired PNT subsequent to the contract at issue.

7. 41 U.S.C. §§ 601–13 (1987).

under 7 C.F.R. § 24.4(a) (1976),[8] because, the Board concluded, PNT's contract had no disputes clause. Instead, the Board agreed with PNT that it could exercise jurisdiction under 7 C.F.R. §§ 24.4(e) and 24.5.[9] The Board also expressed the view that "[d]etermination of the contract price is not an award of damages within the limitation on jurisdiction to award monetary damages (7 C.F.R. 24.4(e)(3))."

PNT appealed the Board's decision to the Federal Circuit on October 19, 1990. Because the dispute arose before March 1, 1979, the effective date of the CDA, the Federal Circuit dismissed the appeal for lack of jurisdiction and transferred the case here pursuant to 28 U.S.C. § 1631 (1988). The court specified that by its transfer of the case, it expressed "no opinion on the Claims Court's jurisdiction." [10]

PNT contends that jurisdiction is proper here under the Tucker Act. Moving to dismiss, defendant urges that the claim is outside the applicable six-year limitations period, 28 U.S.C. § 2501 (1988). Defendant contends that at best, PNT's claim accrued on January 1, 1982, the day following contract expiration.

PNT's opposition to dismissal is summarized in the following argument:

(1) Section 22 of the contract was a "disputes clause" which directed that a complaint "as to *any* action taken by a Forest Officer respecting this contract" had to be filed with the "forest officer having jurisdiction" (in this case the Secretary acting through the AgBCA) or it would not be "considered." Under then existing law [11] (*i.e.,* June 10, 1977, prior

to passage of the Contract Disputes Act, 41 U.S.C. § 601), plaintiff had to exhaust its administrative remedies by filing an administrative appeal of the Chief's rate redetermination with the AgBCA before filing an action in this court. *Crown Coat Front Co. v. United States,* 386 U.S. 503 [87 S.Ct. 1177, 18 L.Ed.2d 256] (1967);

(2) the final agency action in this case was the decision of the AgBCA on behalf of the Secretary which was announced on September 13, 1990; and

(3) Plaintiff filed its complaint with this Court within one year of this final agency action which was the date on which the cause of action accrued.

(Emphasis in original.)

Defendant counters that ¶ 22 is not a disputes clause (1) because it lacks elements essential to the creation of a disputes clause and those elements cannot be drawn from regulations or otherwise inferred, (2) because PNT is estopped from arguing that ¶ 22 is a disputes clause based on its own admission before the Board, and (3) because ¶ 22 is merely a provision requiring notice of a complaint. Therefore, according to defendant, since there was no disputes clause, PNT's resort to the administrative remedy provided by the AgBCA was permissive and not mandatory. PNT should not have waited for the Board to render its decision before filing in the Claims Court. Because PNT chose not to file concurrently in this court, the statute of limitations has now run and its claim is barred. For the following reasons, the

---

**8.** Section 24.4(a) provides as follows:

*Decisions of contracting officers of the Department of Agriculture and Commodity Credit Corporation.* The Board shall have jurisdiction of appeals taken from decisions of contracting officers of agencies of the Department of Agriculture and Commodity Credit Corporation within the scope of the Disputes Article of Contracts.

**9.** Section 24.5 provides as follows:

**Time for filing notice of appeal.**—A notice of appeal shall be filed within 30 days from the date of receipt of the decision of the contracting officer or within such different time as may be prescribed in the contract or

other applicable regulation of the Department, provided, that in case of appeal under § 24.4(e), the notice of appeal shall be filed within 30 days from the date of receipt of the decision of the contracting officer of the Forest Service. The time for filing a notice of appeal shall not be extended by the Board.

**10.** Effective October 29, 1992, the United States Claims Court was renamed the United States Court of Federal Claims. Federal Courts Administrations Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992).

**11.** PNT apparently refers here to the Wunderlich Act, 41 U.S.C. § 321 (1988).

court concludes that the defendant is correct.

## II. DISCUSSION

■ This court has no authority to entertain Tucker Act claims not brought "within six years after such claim first accrues." 28 U.S.C. § 2501. In contract cases, the action accrues, at the latest, when the contract is completed. *Nager Elec. Co. v. United States*, 177 Ct.Cl. 234, 241, 368 F.2d 847, 852 (1966). In the present case, PNT's contract was completed on December 31, 1981. Therefore, unless the limitations period was tolled, PNT was required to commence its suit prior to January 1, 1988.

PNT's argument for tolling is derived from the Wunderlich Act, 41 U.S.C. § 321 (1988) ("Act"),[12] and cases construing it. The Act was promulgated in response to *United States v. Wunderlich*, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951), *superseded by statute as stated in Hoel–Steffen Constr. Co. v. United States*, 231 Ct.Cl. 128, 684 F.2d 843 (1982), in which the Supreme Court limited the power of the Court of Claims to review disputes within the scope of a standard disputes clause, if the clause provided for a right of appeal to the applicable department head for a "final and conclusive" decision. Congress, in passing the Act, widened the Court of Claims' scope of review to include claims that the agency's decision had been "capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or [wa]s not supported by substantial evidence."

■ By its terms, the Act only applied to "question[s] arising under" government contracts containing dispute clauses. Such questions were distinguished from claims for breach of contract, which immediately gave rise to de novo review in court. *Mul-*

*holland v. United States*, 175 Ct.Cl. 832, 843–44, 361 F.2d 237, 243–44 (1966). In a Wunderlich Act review, on the other hand, the court renders only a limited review of the existing administrative record. *Crown Coat Front Co. v. United States*, 386 U.S. 503, 512–13, 87 S.Ct. 1177, 1182–83, 18 L.Ed.2d 256 (1967), *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963). In *Bird & Sons, Inc. v. United States*, 190 Ct.Cl. 426, 420 F.2d 1051 (1970), the Court of Claims described the distinction as follows:

> To the extent that complete relief is available under a specific provision—*i.e.*, the claim is both cognizable under and adjustable by the terms of the contract— such as the currently standard "Changes", "Changed Conditions", or "Inspection" clauses, the controversy arises under the contract and is subject to initial administrative resolution as provided in the normal "Disputes" article. But *if a fair reading of the particular contract shows that the specific dispute has not been committed to agency decision, the claims are then for a "pure" breach of contract and are considered de novo in this court.*

*Bird & Sons*, 190 Ct.Cl. at 432–33, 420 F.2d at 1055 (emphasis in original). Thus, the six-year statute of limitations is only tolled with respect to matters "arising under" the contract and subject to a disputes clause. If the claim is not subject to a disputes clause, it may be brought directly in the Court of Federal Claims. Appeals to the Court of Federal Claims may be made only following exhaustion of the administrative remedy. *Crown Coat*, 386 U.S. at 511–12, 87 S.Ct. at 1181–82, *Nager Elec.*, 177 Ct.Cl. at 242, 368 F.2d at 854 (1966). For the limitations period to have been tolled, therefore, there had to be mandatory [13] re-

---

12. The Act provides:

> **§ 321. Limitation on pleading contract provisions relating to finality; standards of review.**— No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit

now filed or to be filed as by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

13. See discussion *infra*, pp. 337–38.

sort to a disputes clause. *A fortiori,* if there is no disputes clause in the contract, no tolling occurs with respect to the judicial remedy.

■ PNT argues that ¶ 22 of the contract constitutes such a disputes clause by which it may seek review of the Board's decision in this court. However, ¶ 22 fits neither the definition nor the purpose of a disputes clause. The Act describes a disputes clause as a "provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract." 41 U.S.C. § 321. Paragraph 22 in no way relates to the finality or conclusiveness of any administrative authority. It merely provides that complaints be presented in writing to the "forest officer having jurisdiction." Paragraph 22 does not even state that the "forest officer having jurisdiction" must make a decision at all, much less does it provide for the finality of that decision.

In *American Export Isbrandtsen Lines, Inc. v. United States,* 204 Ct.Cl. 424, 499 F.2d 552 (1974), the Court of Claims delineated the purpose of a disputes clause:

By the terms of a disputes clause, parties agree to bring all factual disputes arising under the contract to the Government contracting officer assigned to the contract. The contracting officer's decision is final on any factual matter unless appealed by a contractor within 30 days to the head of the department administering the contract or his authorized representative, normally a board of contract appeals. Both the contractor and the Government then have an opportunity to present their views of the controversy in a hearing before the board. Where plaintiffs disagree with the determination of the agency under the disputes clause they may bring their appeal to this court under Wunderlich Act standards.

*American Export Isbrandtsen,* 204 Ct.Cl. at 480, 499 F.2d at 585. Paragraph 22 does not reflect this purpose. It does not distinguish between factual and legal disputes, but instead addresses "complaints," without further characterization. It does not distinguish disputes "arising under the contract" from breach of contract disputes, but purports to cover "any action taken by a forest officer respecting this contract." Nor does the paragraph include any reference to a hearing or other process by which both parties may formally present their views. Paragraph 22 is not styled a disputes clause, nor does it even contain the word "dispute," although the disputes clause had been an established mechanism within government contracts since the 1930's.[14] Paragraph 22 falls so far short of the standard clause that it cannot be said with any certainty that the parties ever intended a disputes clause. In sum, the clause PNT offers reflects neither the form nor the substance of a disputes clause.

When PNT filed its complaint with the Board in 1977, it successfully argued that the contract contained no disputes clause. *Pacific Northern Timber Co.,* 91–1 B.C.A. (CCH) ¶ 23,309, 1990 WL 138466 (AgBCA Sept. 13, 1990). In construing today what the parties intended by the contract language, the view taken by PNT at a time closer to the events at issue is certainly relevant. *See H.R. Henderson & Co. v.*

---

**14.** *See United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 404–07, 86 S.Ct. 1545, 1551–53, 16 L.Ed.2d 642 (1966), *citing, e.g., Plato v. United States,* 86 Ct.Cl. 665 (1938), *Phoenix Bridge Co. v. United States,* 85 Ct.Cl. 603 (1937).

Even when compared with disputes clauses in contemporaneous contracts, ¶ 22 is inadequate. *See United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *United States v. Wunderlich,* 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951). The disputes clauses in both *Carlo Bianchi* and *Wunderlich* read as follows:

Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.

*Carlo Bianchi,* 373 U.S. at 710, 83 S.Ct. at 1411; *Wunderlich,* 342 U.S. at 99, 72 S.Ct. at 155.

*United States*, 169 Ct.Cl. 228 (1965); *Handel v. United States*, 16 Cl.Ct. 70 (1988).

In *H.R. Henderson*, a contractor sued the government acting through the Army Corps of Engineers for alleged breach of contract to construct buildings. The parties had previously entered a contract containing a "Disputes" clause that read, in pertinent part, as follows:

Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the contractor, he appeals in writing to the Secretary [of the Army], which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto.

*H.R. Henderson*, 169 Ct.Cl. at 242. Shortly after the construction began, a dispute arose over the interpretation of the contract. Specifically, the parties disagreed as to whether the floor or the walls and roof were to be built first. Invoking the disputes clause, the contractor appealed the contracting officer's decision denying compensation. After a lengthy but unsuccessful round of hearings before the appeals boards, the contractor brought its claim before the court. Once there, the contractor denied that the factual determinations rendered by the agency had come within the purview of the disputes clause and the

Wunderlich Act. The Court of Claims chose not to decide whether the disagreement constituted a breach of contract or merely a dispute "arising under the contract." Instead, the Court of Claims held that under the circumstances, the contractor was estopped from denying that the disputes clause applied to the question the plaintiff presented. *Id.*, at 245; *see also Handel v. United States*, 16 Cl.Ct. 70, 74, *citing McAfee v. United States*, 832 F.2d 152, 154 n. * (Fed.Cir.1987). In like fashion here, PNT should be bound by its arguments and pleadings before the Board that the contract contained no disputes clause.

■ Because there was no disputes clause, the Wunderlich Act does not apply. In pre–CDA cases not including a disputes clause, the plaintiff's course of action ordinarily was limited to a direct appeal to the Court of Claims. *American Export Isbrandtsen Lines, Inc. v. United States*, 204 Ct.Cl. 424, 481, 499 F.2d 552, 586 (1974); *see also S.J. Groves & Sons Co. v. United States*, 228 Ct.Cl. 598, 601, 661 F.2d 170, 173 (1981). In the present case, however, PNT had access to the Board, not based on a contract remedy, but pursuant to 7 C.F.R. § 24.4(e). By its very terms, however, § 24.4(e) appeals are exclusive of circumstances in which a disputes clause provides a basis for Board jurisdiction. Section 24.4(e) merely creates an elective remedy permitting contractors to pursue appeals to the Board in matters not involving a disputes clause.

■ The question then, is whether the pendency of this elective administrative appeal obviated the need to commence a court proceeding. It did not. In this circuit, permissive administrative remedies do not toll the running of the statute of limitations. *Hurick v. Lehman*, 782 F.2d 984, 987 (Fed.Cir.1986), *Camacho v. United States*, 204 Ct.Cl. 248, 259, 494 F.2d 1363, 1369 (1974), *Empire Inst. of Tailoring, Inc. v. United States*, 142 Ct.Cl. 165, 168, 161 F.Supp. 409, 411 (1958). The Board rendered its decision over 32 months after the last possible date for the lapsing of the statute. When PNT saw that a timely decision was not forthcoming, it should

have commenced an action in this court and moved for suspension of proceedings until the Board finalized its decision. In so doing, PNT could have preserved its remedy in this court. However, regardless of the untimeliness of the Board's decision, failure to file within six years of the completion of the contract precludes PNT from resorting to this court now. *See Hurick*, 782 F.2d at 987.

During oral argument, counsel for PNT changed somewhat the character of its argument with respect to ¶ 22. It is PNT's contention that § 24.4(e) is not truly a permissive remedy because ¶ 22 forced it into electing the administrative remedy. PNT states that when it disagreed with the Regional Forester's rate redetermination, ¶ 22 required PNT to bring its written complaint to the "forest officer having jurisdiction"—in this case, the Chief. When the Chief made his decision, ¶ 22's "any action taken by a forest officer" language compelled the contractor to take its written complaint one step further up the ladder to the "forest officer having jurisdiction"—in this case the Board acting on behalf of the Secretary. According to PNT, ¶ 22 had a "domino effect" because unless it pursued its administrative remedy, the two unfavorable decisions would be conclusive. Therefore, PNT claims, it was forced into an appeal to the Board.

This argument is untenable. PNT correctly reasons that without a final decision, it could not come to court. But PNT had a final decision. Its complaint to the Chief was made possible by ¶ 2(c), *"Emergency Rate Redetermination."* The terms of ¶ 2(c) furnished the mechanism by which PNT complained to the Chief about the unreasonableness of the Regional Forester's rate redetermination. PNT was required to submit a "written application" to the Chief explaining why it felt the rates were "unreasonably high," after which the Chief had discretion to make rate changes as he saw fit. Paragraph 2(c) provided no further intra-contract procedure for challenging a rate redetermination. At that point, PNT had the right to challenge the redetermination in court.

The existence of ¶ 22 does not alter the result. PNT reads far too much into the provision. As previously discussed, ¶ 22 is not a disputes clause, but that is precisely what PNT's construction would make it. Instead, ¶ 22 is a notice provision whereby complaints not made timely are later foreclosed. *Cf. Brechan Enters., Inc. v. United States*, 12 Cl.Ct. 545, 548–50 (1987); *Mingus Constructors, Inc. v. United States*, 10 Cl.Ct. 173, 176–78 (1986); *see also Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 93–94 (1989). Once having given notice of the substance of the problem, however, nothing in ¶ 22 requires a contractor to give further notices to keep an issue alive. Such clauses are "litigation avoidance mechanism[s]" with the "practical, not punitive" purpose to "stimulate the Government to take its own investigative action and perhaps corrective measures in conjunction with the contractor." *Brechan Enters.*, 12 Cl.Ct. at 549. In this case, timely notice following the initial rate redetermination allowed the Chief an opportunity to make discretionary changes to render the rates "equitable to the purchaser." This was his final decision. Because no other contract disputes mechanism existed, if PNT believed that the Chief failed to make the proper rate adjustments, then it could have initiated a complaint with our predecessor court and argued that a breach had occurred.

### III. CONCLUSION

It is clear that ¶ 22 and § 24.4(e), whether considered separately or in combination, did not force PNT to resort to the Board. The administrative remedy was permissive, and PNT voluntarily elected to pursue its appeal there. The statute of limitations was not tolled. Plaintiff is therefore barred from pursuing the action here. The motion to dismiss is granted. The clerk is directed to dismiss the complaint. Each side is to bear its own costs.